***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Harris and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications, the Opinion and Award of Deputy Commissioner Harris.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties at the hearing, and/or in the executed Pre-Trial Agreement, as:
 STIPULATIONS *Page 2 
1. The parties are properly before the North Carolina Industrial Commission, and the Commission has jurisdiction of the parties and of the subject matter.
2. The parties have been correctly designated above.
3. This case is subject to the North Carolina Workers' Compensation Act.
4. At all relevant times, an employer-employer relationship existed between defendant-employer and plaintiff.
5. Travelers Indemnity Company of America is the carrier on the risk in this claim.
6. The following exhibits were accepted into evidence as stipulated exhibits:
 a. Plaintiff's Exhibit 1: Executed Pre-Trial Agreement
 b. Plaintiff's Exhibit 2: Industrial Commission Forms
 c. Plaintiff's Exhibit 3: Plaintiff's check stubs dated 2/13/08 and 2/21/08
 d. Plaintiff's Exhibit 4: Parties' discovery responses
 e. Defendants' Exhibit 1: Civietown Volunteer Fire Department staff activity log
 f. Defendants' Exhibit 2: DVD of surveillance footage
7. The issues before the Full Commission on appeal are whether plaintiff sustained a compensable injury on or about February 13, 2008, and if so, to what compensation is plaintiff entitled.
 ***********
Based upon all of the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT *Page 3 
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 59 years old. Plaintiff resides in Supply, North Carolina and has a ninth grade education. For a large part of his working life, he was self-employed as a commercial fisherman. Plaintiff has also worked sporadically in construction, lumbering, dredging and doing odd jobs.
2. Defendant-employer is a commercial roofing contractor. Its primary business involves application of sealant to roofs.
3. Plaintiff began working for defendant-employer as a painter on or about February 1, 2008.
4. On February 12, 2008, plaintiff worked on the roof of an 80-foot high commercial building. During the day, he pulled several venting spools and buckets of sealant onto the roof using a rope. The spools weighed about 30 to 40 pounds each, and the buckets weighed about 70 to 80 pounds each. Plaintiff developed some low back pain during that day.
5. On the following day, February 13, 2008, plaintiff was back on the same roof, doing the same tasks. He pulled up several buckets of sealant, and his low back pain progressively worsened. As plaintiff pulled up the last bucket, he had the onset of severe pain across his lower back that radiated down through his left buttock, and he had pain and numbness down his left leg to his ankle.
6. After plaintiff pulled up the last bucket on February 13, 2008, he told defendant-employer's owner, Tommy Sullivan, who was also on the roof, that he just could not go any further. Mr. Sullivan did not respond to plaintiff and walked away.
7. That evening, plaintiff rode back home with his friend, John Stinson, who also worked with defendant-employer but was on a different roof that day. Plaintiff did not say *Page 4 
anything about his injury or back pain on the ride home. However, plaintiff later told Mr. Stinson that he had pulled something in his back at work.
8. Plaintiff did not return to work for defendant-employer after February 13, 2008.
9. At the hearing, Mr. Sullivan, defendant-employer's owner, stated that he first learned of plaintiff's injury three months later when defendant-carrier's adjustor contacted him. He testified that he did not recall plaintiff telling him there was anything wrong with his back and that it "blew (his) mind" when he was informed of plaintiff's claim. However, the Form 19 completed by defendants stated that defendant-employer first knew of plaintiff's injury on February 13, 2008.
10. Plaintiff went to the office of his primary care provider, Dr. Christopher Isenhour, on February 25, 2008 and saw Dr. Isenhour's nurse practitioner. Plaintiff complained of pain in his left buttock and down his left leg that began when he was lifting a bucket onto a roof. Prior to this visit, plaintiff had presented to Dr. Isenhour with neck pain, but had not complained before of pain radiating into his leg.
11. On February 29, 2008, plaintiff saw Dr. Isenhour and again recounted the incident lifting the roofing materials. Dr. Isenhour diagnosed sciatica based on the nature of plaintiff's low back pain radiating into his left leg. Dr. Isenhour thought that plaintiff had some nerve impingement.
12. Dr. Isenhour felt that, as of February 29, 2008, plaintiff was unable to work because of his low back and left leg symptoms and pain.
13. Plaintiff followed up with Dr. Isenhour on March 26, March 29, May 5 and June 2, 2008 with continuing complaints of low back pain with radicular symptoms into his left leg. *Page 5 
At those visits, Dr. Isenhour continued to feel that plaintiff should not be working because of his low back/left leg condition.
14. Dr. Isenhour considered plaintiff to be a candidate for an MRI and recommended consultation with a specialist. Plaintiff was not able to afford further treatment. The treatment plaintiff received with Dr. Isenhour was provided at reduced cost through a charity care organization, and Dr. Isenhour only prescribed medications that were available at reduced cost.
15. Dr. Isenhour recommended to plaintiff that he stay as active as he could tolerate. However, Dr. Isenhour stated that, if plaintiff's back condition were the same as of the Deputy Commissioner's hearing as it had been as of his last consultation on June 2, 2008, then plaintiff was still unable to work as of the hearing.
16. Dr. Isenhour believed that plaintiff's low back condition that he treated from February through June 2008 was caused by the February 13, 2008 lifting incident.
17. Plaintiff stated he still had pain across his low back, into his left buttocks, and down his left leg into his calf at the hearing. Plaintiff's low back pain still came and went, and his left foot stayed numb from the ankle down. Plaintiff's pain typically stayed at about the 4-5/10 level.
18. In August 2008, plaintiff tried to work as a brick mason's helper. Plaintiff was only able to work for about four hours before his back and left leg pain got so bad that he had to stop. Since his injury, plaintiff had also tried several times to go commercial fishing but was unable to continue because of increased back and left leg pain.
19. Plaintiff has a 14-foot johnboat that he takes on personal fishing outings on the creeks near his home two to four times per week. He fishes with rod and reel or gill nets and also collects clams and oysters. Plaintiff has made a little money here and there (for example, *Page 6 
$25.00 for selling a bushel of oysters), but much of his fishing is for subsistence. When his back and left leg pain become too much for him to bear, plaintiff stops fishing.
20. Defendants introduced about three minutes of surveillance footage of plaintiff returning from a fishing outing on May 12, 2008. In the footage, plaintiff moved very slowly. Plaintiff climbed on his boat trailer at the base of the boat ramp, lifted the bow of his johnboat out of the water and onto the back of the trailer, bent over at the waist to attach the line to the bow, and then cranked the winch to pull the boat up onto the trailer. Plaintiff's johnboat is stern-heavy because of the motor, and it does not appear difficult to lift the bow onto the back of the trailer. Later in the footage, using his boat as an aid, plaintiff stepped up about two feet onto a loading dock.
21. There is nothing in the brief surveillance footage that is inconsistent with someone who is suffering from significant low back and left leg pain. Further, it appears that plaintiff's limited fishing activities are consistent with Dr. Isenhour's recommendation that plaintiff stay as active as reasonably possible.
22. Both before and since February 13, 2008, plaintiff has been an auxiliary member of his local volunteer fire department. His function is to help with traffic control at the scene of the call. The volume of calls that he has responded to has remained about the same before and after the February 13, 2008 incident. Plaintiff is paid $3.00 per call.
23. Defendant-employer paid two paychecks to plaintiff: (1) on February 13, 2008, $123.00 for 14 hours, with $17.00 deducted for insurance; and (2) on February 21, 2008, $316.00 for 37 hours, with $17.00 deducted for insurance.
24. Plaintiff was paid about $9.00 per hour by defendant-employer. Working with water-based product, if the weather is perfect, defendant-employer's employees work 40 hours *Page 7 
per week. However, it is more likely that they average about 25 hours per week, which the Full Commission finds plaintiff would have averaged had he continued working with defendant-employer.
25. Further medical treatment for plaintiff's low back condition is reasonably required to effect a cure, provide relief and/or lessen the period of plaintiff's disability.
26. The Full Commission finds that the greater weight of the evidence supports a finding that plaintiff sustained an injury to his low back by specific traumatic incident on February 13, 2008.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On February 14, 2008, plaintiff sustained a compensable low back injury by specific traumatic incident of the work assigned arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff has shown that he was disabled as a result of his compensable low back/left leg condition from February 14, 2008 through June 2, 2008. During said period, plaintiff was either physically incapable of work in any employment, or, if he was capable of some work, it would have been futile for him to seek employment commensurate with his physical limitations because of his age, work experience and educational level. As such, plaintiff is entitled to temporary total disability benefits for said period. N.C. Gen. Stat. § 97-29 and Russell v. Lowes ProductDistribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993). Because *Page 8 
plaintiff was unable to pay for medical treatment, there is insufficient evidence from which to determine the extent of any disability after June 2, 2008.
3. Plaintiff's limited fishing activities and duties with his local volunteer fire department are not indicative of wage-earning capacity of plaintiff and do not preclude a showing of disability or disqualify plaintiff from temporary total disability compensation.
4. Given plaintiff's very short time working for defendant-employer, and lack of evidence in the record about the earnings of comparable workers, it is appropriate to use the fifth method of N.C. Gen. Stat. § 97-2(5) to approximate plaintiff's average weekly compensation he would have earned, but for his injury. Estimating 25 hours per week worked at a rate of $9.00 per hour, plaintiff likely would have yielded an average weekly wage of $225.00, and therefore a compensation rate of $150.00.
5. Defendants shall pay past medical treatment plaintiff received from Dr. Isenhour's office for his compensable low back/ left leg condition, including examinations and prescriptions. Defendants shall authorize and pay for plaintiff's further medical treatment for his compensable low back/left leg condition, including but not limited to an independent medical examination. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee provision below, defendants shall pay to plaintiff, in a lump sum, back temporary total disability compensation in the amount of $150.00 per week for *Page 9 
the period of February 14, 2008 through the June 2, 2008. Payment of temporary total disability shall be suspended after June 2, 2008 until evaluation by a specialist as ordered below.
2. A reasonable attorney's fee in the amount of 25% of the lump sum payment due plaintiff, in Paragraph 1 above, shall be deducted and paid directly to plaintiff's counsel. Should continuing disability be determined appropriate, defendants shall also make every fourth ongoing temporary total disability check to plaintiff's counsel.
3. Defendants shall pay for the treatment that plaintiff previously incurred and to be incurred for his compensable low back/left leg condition with Dr. Isenhour's office, including consultations and prescriptions. To the extent that plaintiff and/or any third-party payor paid for such treatment, defendants shall reimburse such payor(s) in full.
4. Defendants shall promptly authorize an evaluation of plaintiff by a specialist of Dr. Isenhour's choice to evaluate and treat plaintiff's compensable low back/left leg condition and shall, subject to the limitations period of N.C. Gen. Stat. § 97-25.1, authorize and pay for any treatment that such specialist recommends for plaintiff's compensable low back/left leg condition.
5. The issue of plaintiff's continuing disability beyond June 2, 2008, is reserved pending additional evidence, specifically the completion of an independent medical examination. If the parties cannot agree on the extent of any continuing disability, either party may file a Form 33 to request a new hearing.
6. Defendants shall pay the costs. As part of their costs, if they have not done so already, defendants shall pay an expert witness fee to Dr. Isenhour, the amount of which Deputy Commissioner Harris set in an Order filed on June 17, 2009.
This the 16th day of March 2010. *Page 10 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ STACI T. MEYER COMMISSIONER